**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **VS.** | ) | **1:22-cr-0140-SDN** |
| | ) | |
| **PAUL ARCHER,** | ) | |
| **DEFENDANT** | ) | |


## <u>PAUL ARCHER'S SENTENCING MEMORANDUM</u>


**TABLE OF CONTENTS**                                                      **Page**

BACKGROUND…………………………………………………………………2

1. Summary of Position ................................................................................... 3

2. Agreement for Purposes of Sentencing ...................................................... 3

3. Pre-Sentence Report and Advisory Guidelines .......................................... 3

4. Introduction to Paul Archer ....................................................................... 3

5. Non-Guideline or Variant Sentence ........................................................... 8

ARGUMENT

A sentence of time-served with three years of supervised release is appropriate based on the history and characteristics of Mr. Archer...……………………….......................10

A.  VARIANT FACTORS

1.  Variant Factor-The Collateral Consequences of the Federal Conviction……..10

2.  Variant Factor-Cost of Incarceration Instead of Supervision…………………13

3.  Variant Factor-Employment History…………………………………………20

4.  Variant Factor-Law Abiding…………………………………………………22

5.  Variant Factor-Post-Offense Conduct………………………………………..23

6.  Variant Factor-Childhood……………....…………………………………..25

SUMMARY………………………………………………………………………..28

REQUESTED SENTENCING RECOMMENDATIONS………………………28

## BACKGROUND

### 1.  Summary of Position

We ask the Court to impose a below-guidelines sentence of time served (nine months and 18 days) and three-years of supervised release. Taking into consideration supervision rather than incarceration, Paul's difficult family life, his work history, the consequences of a felony conviction, the lack of any significant prior criminal history, as well as other issues discussed *infra*, this sentence is "sufficient but not greater than necessary" based on variances and application of the sentencing factors set forth in 18

U.S.C. §3553(a), in particular, the nature and circumstances of the offense and Paul's characteristics.

### 2. Agreement for Purposes of Sentencing

Paul and the Government have entered a Plea Agreement. <u>See</u> *ECF #123*.

### 3. Pre-Sentence Report and Advisory Guidelines

The disputed PSR establishes a total offense level of 18 and a criminal history category of I. *ECF #136.* This creates a sentencing range of 27-33 months. Id. at ¶109.

### 4. Introduction to Paul Archer

Paul Archer ("Paul") is a 46-year-old male. Paul is not a perfect person and has had ups and downs in his life and his career, and he has made missteps along the way, missteps that bring him before this very Court. Paul acknowledges these mistakes which were significant enough to amount to crimes. Paul is far more, however, than the measure of his improper actions. As will be detailed at the sentencing hearing, Paul is a very good person and has been an exceptional friend to many people, a devoted son and is often providing assistance to those around him without any thought to a benefit for himself. Paul deserves this Court's consideration, not only from the perspective of the crimes he committed, but with respect to the total picture of who he

is as a person standing before this Court, having made mistakes and yet also lived a productive life that has had a positive impact on countless others. While the Presentence Report ("PSR") details some of Paul's life and history, his personal journey, from birth to the present day, provides the color to the otherwise black and white recitation of who he is as reflected in the PSR.

By way of summary, Paul was born in Bangor, Maine in 1979 to Darrell and Robin Archer. He was only a toddler when they moved to California following his parent's divorce, the first of over 20 times Paul moved before the age of 25. It is no surprise that Paul was diagnosed with adjustment disorder. Paul and his brother resided with his father, who was a hardworking construction engineer. But with the hard work came frequent moves and Paul never felt settled, thus producing anxiety which continues today.

Paul doesn't remember much of his very early childhood and that might be for a medical reason. When he was two years old, he was thrown out of a second story window. His Aunt Debbie recalls him being home and everyone was drinking. His aunt's boyfriend, responding to the crying toddler, threw him out of the window. His father responded in kind.

As a child, Paul very much looked up to his older brother David, as the frequent moves made it difficult to build friendships. But David had mental health issues that led to horrible behavior towards his younger brother including attempting to strangle Paul when he was just eight years old. Prior to Paul's teenage years, David was

removed from the home for the first time and placed in a facility for teenaged lawbreakers. This was the first time in a pattern that would see David in and out of incarceration as he battled addiction and psychological issues.

At the age of 14, Darell saw some of the same behaviors in Paul that existed in David, including addiction, and knowing he worked too much to be at home to watch him, Paul was sent to live with his Mother in Maine. This very much backfired. Robin was a full-fledged alcoholic by this time, and like life with his father, Paul moved frequently. He dropped out of school and began abusing drugs. During the time Paul was residing with her, she spent some time in jail, but as he recalls, it didn't really matter because she was never home anyway. A couple of times, she would through him out and she was never really concerned where he was when he wasn't at home. In retrospect, Paul sees the relationship with his mother affecting how he views relationships with women in his life. Movies like 8 Mile[1] hit a very personal note for Paul.

At the age of 17, Paul returned to California, but by this time, he was withdrawn from society, angry, broke, depressed, and addicted to drugs. He was directionless, not sure what he wanted to do with his life. He worked for his father some and did various odd jobs This lasted for about nine years. At the age of 26 his ex-wife's

---

[1] In the hit autobiographical film staring Marshall Mathers, better known as Eminem, the true story of his childhood with an alcoholic and abusive mother is depicted.

parents bought him a computer for his birthday. Paul suddenly had direction and purpose. He also had a reason to get sober something he largely credits to his father, who worked with him on getting sober, which Paul was able to do, although he acknowledges that there have been times when he has not been able to maintain sobriety. Paul credits his father, computer, and medication for his life. But it also around this time when Paul had another incident with his brother. This time, he pulled a knife and tried to kill him. David ended up incarcerated. They would not speak again until 2020. During that period of incarceration, David's son Jacob came to live Paul. It was the closest thing Paul had to a son and he made the most of the relationship, providing Jacob the direction that Paul never had as a teenager.

In 2012, Paul married Beatrice Whipple. They were together for seven years in what Paul describes as a toxic relationship that often involved drug use. They divorced in 2019 and Paul then moved to Florda, where his Father resided. Near the end of his marriage, Paul's mother died from alcoholism. As he states, she literally drank herself to death. They were largely estranged before she died because she stole money from him. Paul had received unemployment benefits and had a few thousand dollars in back payments mailed to him. He put them in control of his mother who spent the money. He went to see her in the hospital the day before she passed away and forgave her. Even in death, the relationship was strained as her husband took her ashes after Paul paid for the cremation.

Only two years after his mother's death, Paul was hit with another loss. The brother that he idolized at times and who also tried to kill him twice died in 2021. To this day, Paul struggles with his feelings on how to process this. He wonders if he ever will truly be able to.

It was during the marriage that the basis for the criminal charges occurred. But to understand some of the reasons for what occurred is to understand how life has impacted Paul's thinking. Take the bankruptcy matter, for example. Even assuming that the American Express cards existed and were active, the amount discharged in the bankruptcy was less than 100k. Now add in the likelihood that at least half of the American Express accounts did not exist, if Paul felt that he could trust a seasoned expert in the field, would filing have even made sense? Similarly, a good qualified tax attorney could have helped early in the process, but Paul has been reticent to trust others. This is not an excuse but is easier to understand when learning about his life.

Paul also admits he can sometimes go from one extreme to the other. Overweight and unhealthy during his substance abuse years, he decided in 2022 partially thinking of his brother's early death, that he wanted to train for an Ironman Triathalon. During his training, he crashed his bike, causing a multitude of injuries to his lung, ribs, gallbladder, and shoulder. This led to major shoulder surgery and an injury that bothers him to this day. But the silver lining is he developed a love for fitness and staying in shape, which is a direct repudiation of substance use and abuse. He truly

believes that such a mindset will continue to make him emotionally and physically healthier.

Today, Paul has incredible aspirations. He is working on his pilot's license, he has great ideas for marketing software. Paul is committed to change in his life, recognizing that he has made significant errors that have brought him before this Court, while at the same time trying to remain optimistic about the future. Paul continues to be devoted to his family. He asks this Court to consider all of this when affixing its appropriate sanction.

## **<u>Non-Guideline or Variant Sentence</u>**

The Supreme Court stated in *Pepper v. United States* that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" 562 U.S. 476 (2011) <u>quoting</u> *Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996)). Courts need not adhere to the rigidity of the Sentencing Guidelines. *U.S. v. Booker*, 543 U.S. 220 (2005). In fact, the district judge "may not presume that the Guidelines range is reasonable … ." *Gall v. U.S.,* 552 U.S. 38, 39 (2007); <u>see</u> *Nelson v. U.S.*, 129 S.Ct. 890, 891 (2009) (per curiam) (guidelines are "not

to be presumed reasonable"); *Peugh v. U.S.,* 133 S.Ct. 2072, 2080 (2013) ("The court may not presume that the Guidelines range is reasonable.")

A departure and/or variant sentence is appropriate in this matter based on the application of the sentencing factors in 18 U.S.C. §3553(a) which provides in pertinent part:

> *"The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The Court, in determining the particular sentence to be imposed shall consider-*
>
> *(1) the nature and circumstances of the offense and the history and characteristics of the defendant;*
>
> *(2) the need for the sentence imposed—*
>
> *(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;*
>
> *(B) to afford adequate deterrence to criminal conduct;*
>
> *(C) to protect the public from further crimes of the defendant; and*
>
> *(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

## ARGUMENT

I.    **A SENTENCE OF TIME SERVED IS APPROPRIATE BASED ON THE HISTORY AND CHARACTERISTICS OF PAUL ARCHER**

## A.  FACTORS SUPPORTING A VARIANT SENTENCE

### 1.  Variant Factor – The Collateral Consequences of the Federal Conviction

Paul is aware that he engaged in unlawful activities and that leads to serious and deserved consequences. He was aware of this from the time that he relinquished his Constitutional right to a trial and agreed to accept responsibility for his actions by pleading guilty, saving the government the time and expense of a trial. He is also aware that his actions will have consequences that will remain with him for the rest of his life.

There are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons. See generally American Bar Association, Nat'l Inventory of the Collateral Consequences of Conviction, abacollateralconsequences.org; see also How to Get Around A Criminal Conviction, N.Y. TIMES, at A22 (Oct. 19, 2015) ("Some 70 million to 100 million people in the United States-more than a quarter of all adults-have a criminal record, and as a result they are subject to tens of thousands of federal and state laws and rules that restrict or prohibit their access to the most basic rights and privileges-from voting, employment and housing to business licensing and parental rights.").

Many Courts have considered the collateral impact when determining sentences. See *U.S. v. Stewart*, 590 F.3d 93, 141-2 (2nd Cir. 2009)( "{i}t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). Some holdings in the various circuits have been as follows:

- Second Circuit: Approved as reasonable a variance from guidelines of 78-97 months to 20 months, because the defendant's conviction for violating rules against communicating with a prisoner "made it 'doubtful that [he] could pursue' his career as an academic or translator." *Id.* The court commented that "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *Id.*
- Fourth Circuit: Affirmed a 36-month variance for a child pornography defendant, based in part on the fact that he lost his teaching certificate and state pension as a result of his conduct: "Consideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence.'" *United States Pauley,*511 F.3d 468, 474 (4th Cir. 2007).
- Seventh Circuit: Affirmed 50-month variance from guidelines of 121-151 in child pornography case, in part because conviction ruined a 24-year-old music student's future career as a teacher and church musician, and imposed lifelong stigma. *United States v. Wachowiak,*496 F.3d 744 (7th Cir. 2007); see also *United States v. Owens*, 145 F.3d 923 (7th Cir. 1998) (affirming downward departure based on extraordinary family circumstances, including that defendant's wife and three young children might have to move to public housing and receive welfare benefits if defendant received a prison sentence).
- Eighth Circuit: Affirmed a 7-month variance for a defendant convicted of insider trading and money laundering, based in part on how the defendant "suffered atypical punishment such as the loss of his reputation and his company." *United States v. Anderson,* 533 F.3d 623, 633 (8th Cir. 2008); see also *United States v. Garate*, 543 F.3d 1026 (8th Cir. 2008) (court properly considered lasting effects of registering as a sex offender in deciding to impose below-guideline sentence).

The First Circuit indirectly addressed this issue in *United States v. Prosperi*, where it upheld sentences of six months home monitoring, 1,000 hours of community service,

and three years of probation in a matter with a guideline range of 87 to 108 months incarceration. 686 F.3d 32 (1st Cir. 2012). In that case, the Court emphasized that the defendants did not profit from their misconduct nor create a significant safety hazard and the Court discussed the impact of the criminal charges stating "I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed…" *Id*. These "critical findings" were supplemented with considerations of individual circumstances supporting probationary sentences. *Id*.

As eloquently referenced in *Prosperi*, it is difficult to stand in Paul's shoes, who now faces significant consequences that are warranted and immeasurable. Convicted felons are less likely to be hired for general employment. See *Ex-Offenders and the Labor Market*, U.S. Center on Economic and Policy Research, (2010)(finding that a felony conviction significantly reduces the ability of ex-offenders to find jobs, costing the U.S. economy an estimated $57 to $65 billion annually in lost economic output). http://cepr.net/documents/publications/ex-offenders-2010-11.pdf; see Devah Pager, Marked: Race, Crime, and Finding Work In An Era of Mass Incarceration vii (2007)("the results of the study provide clear evidence for the significant effect of a criminal record,

with employers using the information as a screening mechanism, weeding out ex-offenders at the very start of the hiring process. As a result, ex-offenders are one-half to one-third as likely to receive initial consideration from employers as equivalent applicants without criminal records. Mere contact with the criminal justice system–in the absence of any transformative or selective effects–severely limits subsequent job prospects. The mark of a criminal record indeed represents a powerful barrier to employment.")

This is of particular concern in this matter especially considering the restrictions that probation and the Government seek to impose on Paul. <u>See</u> *United States v. Gardellini*, 545 F.3d 1089 (DC Cir. 2008)(upholding non-guidelines sentence of probation and a fine for defendant convicted of filing false tax returns where guidelines range was 10-16 months because defendant had accepted responsibility, a minimal -65- risk of recidivism, had already suffered substantially and been treated for stress, and the only real deterrent in these cases are the efforts of prosecutors to enforce the laws, not harsh prison sentences).

### 2. <u>Variant Factor- Cost of Incarceration Instead of Supervision</u>

The annual cost of detaining federal prisoners before trial and after sentencing is significantly higher than the cost of supervision in the community, according to figures compiled by the Administrative Office of the U.S. Courts. This was the subject of an

extensive study just eight years ago. In fiscal year 2016, detaining an offender before trial and then incarcerating him post-conviction was roughly eight times more costly than supervising an offender in the community. Placing an offender in a residential reentry center was about seven times more costly than supervision.  United States Courts, published on August 17, 2017, found at http://www.uscourts.gov/news/2017/08/17/incarceration-costs-significantly-more-supervision.

This is also summarized (and updated) in the PSR. *PSR at ¶120*. As the graph shows, it costs just under $4000 more per month to incarcerate Paul as opposed to supervising him. *Id.* See also Speech of Former Attorney General Eric Holder delivered on August 12, 2013 before the ABA convention in San Francisco: "Our current incarceration polity "imposes a significant economic burden — totaling $80 billion in 2010 alone — and it comes with human and moral costs that are impossible to calculate." found at http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html. See also Testimony of Justice Anthony Kennedy before the Senate Judiciary Committee February 14, 2007 in response to Senator Whitehouse ("Our sentences are too long, our sentences are too severe, our sentences are too harsh... [and because there are so few pardons] there is no compassion in the system. There's no mercy in the system."), *video link* accessible at Professor Berman's Sentencing Law and Policy Blog of Feb. 15, 2007); see July 9, 2006 Speech of Justice Anthony Kennedy at the Ninth Circuit Judicial

Conference ("I think the guidelines are far too severe...The fact that the prison guards' association lobbies for higher penalties is sick,")(found at http://talkleft.com/new_archives/015288.html); see also August 9, 2003 Speech of Justice Kennedy at the ABA Annual Meeting (available at http://www.abanews.org/kencomm/amkspeech03.html)("Our resources are misspent, our punishments too severe; our sentences too long... the sentencing guidelines are responsible in part for the increased terms....[and they] should be revised downward."); *U.S. v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011) (" One of our most thoughtful jurists reminds us, "[o]ur resources are misspent, our punishments too severe, our sentences too long." Justice Anthony M. Kennedy, Address at the American Bar Association Annual Meeting, San Francisco, Ca. (Aug. 9, 2003), *available at* http://meetngs.abanet.org/webupload/commupload/CR209800/newsletterpubs/Justice_Kennedy_ABA_Speech_Final.pdf. "); *U.S. v. Khan*, 325 F.Supp. 218, 227 (E.D.N.Y. 2004) (same); *U.S. v. Ranum*, 353 F.Supp. 2d 984, 985 n.1 (quoting Justice Kennedy's statement that "our punishments [are] too severe, our sentences too long")

To calculate specifically, a 10-month sentence in this matter would cost $43,090.00 while a three-year period of supervised release would cost $14226.00 *PSR at ¶120.* Courts that have addressed this issue have cited these findings when imposing sentences. See *U.S. v. Moreland*, 366 F.Supp.2d 416, 422 (S.D.W.Va.,2005)(imposition of guideline sentence would cost the taxpayers an enormous amount of money) *remanded*

*on other issue; U.S. v. Angelos,* 345 F.Supp.2d 1227 (D. Utah 2004) ("Given that holding a person in federal prison costs about $23,000 per year… . [M]oney could also be spent on other law enforcement or social programs that in all likelihood would produce greater reductions in crime and victimization"); *U.S. v. Chavez*, 230 F.3d 1089, 1092 (8th Cir. 2000) (Bright, J., concurring) ("It costs the United States government and its taxpayers approximately $22,000 per year to keep a federal offender in prison. Therefore, it will cost the taxpayers $836,000 for his incarceration. This sentence is a waste of time, money, and more importantly, a man's life. These unwise Sentencing Guidelines put nonviolent offenders in prison for years, they ruin the lives of the prisoners, their families, and they also hurt our economy and our communities by draining billions of dollars from the taxpayers and keeping potentially productive members of society locked up. The opportunity costs imposed by the Sentencing Guidelines are staggering")[2]; *U.S. v. Bernier*, 758 F.Supp. 195 (S.D.N.Y. 1991)(sentencing distortion "produces an economic as well as personal consequence"); *U.S. v. Gonzalez-Monterroso*, 745 F.3d 1237, 1243 (C.A.9 (Ariz.),2014)("and for no truly good law enforcement reason … widespread incarceration at the federal, state, and local levels is both ineffective and unsustainable.  It imposes a significant economic burden — totaling $80 billion in 2010 alone — and it comes with human and moral costs that are impossible to calculate");

---

[2] It is noteworthy that Paul, like Mr. Chavez, was convicted of as non-violent offense.

*U.S. v. Hughes,* 825 F.Supp. 866, 868 (D.Minn.,1993) ("[L]engthy incarceration substantially diminishes the likelihood that the defendant will be able to become a productive member of society upon his release. Second, the monetary cost to the American taxpayer of this incarceration will exceed $270,000. Further, the non-rehabilitation purposes of incarceration-retribution, deterrence and incapacitation-would all be more than adequately served by a far shorter sentence. Both society and the defendant will pay a dear cost for this sentence and receive very little in return"); *U.S. v. Dossie*, 851 F.Supp.2d 478, 483 (E.D.N.Y. 2012) ("the drug-offense Guidelines ranges are excessively severe. In formulating those ranges, the Commission decided to jettison its pre-Guidelines data and instead chose to make the sentencing range in every single drug case proportional to the onerous mandatory sentences meant only for leaders and managers");

a.  Incarceration in this matter will not serve as a deterrence

Empirical studies show there is no relationship between sentence length and general or specific deterrence. See Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A review of Research 28–29 (2006); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995); Donald P. Green & Daniel Winik, *Using*

*Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (all concluding there is no correlation between sentence length and crime rates).

Incarceration can be deleterious to public safety for individuals like Paul whose convictions are non-violent. *See, e.g.*, *United States Sentencing Commission*, <u>Sentencing Options Under the Guidelines</u> (1996) (recognizing the "criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties"); Justin Murray, *Reimagining Criminal Prosecution*, 49 American Criminal Law Review (2012) at 1565 ("Rather than rehabilitating prisoners, modern incarceration tends to make prisoners more violent, antisocial, and prone to criminality"). "Most who study prison life believe there are significant brutalizing effects to imprisonment that impair prisoners' inclination to conform to the law." *Id*. <u>quoting</u> Dina R. Rose & Todd R. Clear, *Incarceration, Social Capital and Crime: Implications for Social Disorganization Theory*, 36 Criminology 442, 465 (1998). <u>See</u> *also United States v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y., 2011) ("Recidivism may be promoted by the behavior traits prisoners develop while incarcerated." To survive, they "tend to develop characteristics institutionally selected for survival: circumspection, canniness, coldness, and cruelty.") Furthermore, according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial

sanctions." Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S–51S (2011).

Courts across the country are recognizing the value to the defendant and the public of treatment instead of incarceration. They are acknowledging that for certain offenders, probation or home detention with cognitive treatment is the appropriate sentence. *United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) (where defendant convicted of possession of child pornography and guidelines called for 33–40 months prison, district court's sentence to probation reasonable in part because of district court's "strong emphasis on [defendant's] general need for treatment"); *U.S. v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (9th Cir. 2008) (in matter where guidelines of 41-51 months, court's sentence of probation with community service not an abuse of discretion); *U.S. v. Vega*, 545 F.3d 743 (9th Cir. 2008) ("We agree with the Seventh Circuit that the imposition of... community service conditions will further the statutory goal of providing 'the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" quoting 18 U.S.C. § 3553(a)(2)(D)("...community service is another opportunity for a defendant to obtain education and vocational training"); *U.S. v. Gonzales*, 163 F.Supp.3d 1078, 1129 (D.N.M., 2016)(downward variance granted in fraud case in part because "the actual loss here is considerably below the intended loss.")

Finally, in this matter, Paul will be sentenced over seven years from the date of many of the criminal activities. "The deterrent value of any punishment is, of course,

related to the promptness with which it is inflicted." *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981)(*Stevens, J.,* concurring in denial of cert.)

### b.  There is minimal risk of recidivism

Paul Archer is 46 years old. As this Court is aware, age is a major factor when looking at recidivism rates. See *U.S. v. Payton,* 754 F.3d 375 (6th Cir.  2014) (court's sentence was unreasonable because court did not consider that recidivism greatly decreases with age. "The Sentencing Commission has observed that "[r]ecidivism rates decline relatively consistently as age increases."); *U.S. v. Neelum,* 2005 WL 300073(granting non-Guideline sentence and noting that recidivism rate for defendants between the age of 41 and 50 with a criminal history category of less than III (like Paul) is less than half that of defendants under the age of 21).

### 3.  Variant Factor- Employment History

As discussed *supra*, Paul has a decent employment history and will continue to be employed moving forward. He has incredible computer skills evidenced by his tax debt which was generated by income and great ideas for the future. The only times he has not maintained some form of employment, whether it is working for his father or starting his

own company was when he had substance abuse addiction or was in the midst of depression.

Numerous courts have considered current and past employment as a factor for consideration in sentencing. In *U.S. v. Ruff*, the circuit court affirmed the district court's consideration of the defendant's "history of strong employment" in granting a variance from 30-37 months' imprisonment to one day of imprisonment followed by three years' supervised release (to be partially served in a community confinement facility), in part so that the defendant could continue to work. 535 F.3d 999, 1001 (9th Cir. 2008). The Third Circuit affirmed a below-guideline sentence of probation, community service, restitution, and fine on a conviction for tax evasion, which was based in part on the defendant's employment record. *U.S. v. Tomko*, 562 F.3d 558, 571 (3rd Cir. 2009) (*en banc*) ("{t}his variance took into account his negligible criminal history, his employment record, his community ties, and his extensive charitable works as reasons for not incarcerating the defendant"); *U.S. v. Fuson*, (6th Cir. Feb. 8, 2007) (unpub) 2007 WL 414265(guideline range of 24-30 months, court's sentence of probation and 6 months home confinement reasonable in part because client's "working and supporting his family … entitled to some weight"); *U.S. v. Jones*, 158 F.3d 492 (10th Cir. 1998) (where defendant pled guilty to possession of a firearm by a prohibited person, the district court did not abuse its discretion in departing downward by three levels when, as one of eleven factors, it considered the defendant's "long impressive work history ...where good jobs are scarce");

*U.S. v. Alba,* 933 F.2d 1117 (2nd Cir. 1991) (long-standing employment at two jobs);

*U.S. v. Jagmohan*, 909 F.2d 61 (2nd Cir. 1990) (exceptional employment history and

nature of the crime); *U.S. v. Big Crow*, 898 F.2d 1326, 1331-32 (8th Cir. 1990)

(excellent employment record).


    4.  <u>Variant Factor –Paul is an Otherwise Law-Abiding Citizen Who Made a
Terrible Mistake</u>

Paul concedes that he does not qualify for a variance based on his action being

aberrant because in 2000, the Sentencing Commission imposed limitations on what is to

be considered aberrant behavior. U.S.S.G. §5K2.20. A departure for aberrant behavior is

authorized for "a single criminal occurrence or single criminal transaction (which is

somewhat broader than a single act) and is limited to offenses (A) committed without

significant planning; (B) of limited duration; and (C) and that represent a marked

deviation by the defendant from an otherwise law-abiding life." Of interest is that Paul

could be eligible for a departure if the Court was to consider this a single criminal

occurrence and one could argue that the two matters are interrelated. §5K2.20.

Not being eligible for a departure or variance under U.S.S.G. §5K2.20 does not

preclude the Court from a variance. <u>See</u> *United States v. Howe*, 543 F.3d 128 (3rd Cir.

2008) (affirming probationary sentence and temporary home confinement for wire fraud

despite an 18-24 month guideline range, where appellate court construed district court to

have termed the offense an "isolated mistake" in the context of Howe's otherwise long

and entirely upstanding life). Similar to that matter, Paul has lived an otherwise entirely upstanding life; he has minimal involvement in the criminal justice system for during his life, and the involvement he had were based on addiction issues. He is a law-abiding citizen who did an incredibly dumb thing. See *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (six level downward departure upheld where district court concluded that defendant was "law abiding citizen, who [did] an incredibly dumb thing" and "was not the type of defendant the guidelines section was designed to punish"); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (time served imposed for possessing a sawed-off shotgun, which appeared to have been prompted by economic pressures of unemployment by a first-time offender who had throughout his 15-year marriage worked at lots of jobs to get education for his six children, even when they lived in homeless shelters, and whose personal investment in his children's care was attested to by a school teacher and a pediatrician).

### 5.  Variant Factor- Post Offense Conduct

Much of Paul's criminal conduct was over seven years ago.  Since that time, he has avoided legal issues, the release violation was really more about his father's actions, positive drug or alcohol tests, and has maintained his close relationship with his family. His conduct while on pretrial release clearly shows that there is minimal chance of

recidivism.[3] See *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008)(defendant's "behavior while on a year-and-a-half pretrial release, which the district court found to be exemplary" shows defendant unlikely to reoffend); *United States v. Baker,* 502 F.3d 465 (6th Cir. 2007)(where defendant pled guilty to possession of unregistered firearm arising from altercation with wife during which gun accidentally discharged and guideline range was 27-33 months, below-guideline sentence of probation with one year house arrest proper in part because he behaved "exceedingly well" while under supervision of pretrial services).

In *United States v. Clay*, the Court sentenced the Defendant to 1/3 of the low end of the guidelines. 483 F.3d 739 (11th Cir. 2007). The Court held that considerations of post offense rehabilitation are appropriate when a district court evaluates the history and characteristics of the defendant and the need to protect the public from further crimes specifically stating that "a departure for post offense rehabilitation reflects that, unlike some other defendants, Clay had fundamentally changed since his offense, poses a lesser risk to the community, and does not require incarceration for too long." *Id.* at 743. These factors all exist in this matter. See *U.S. v. Johnson* 588 F.Supp.2d 997 (S.D. Iowa 2008)("The Court views Defendant's behavior during the three-year period between the seizure of his computer and his indictment as a good indication of what society can expect from him after he completes his sentence [and is a factor court considers in

---

[3] See *Section I(B)(1)(a), supra.*

24

imposing sentence]"); *United States v. D.M.* , 942 F.Supp.2d 327 (E.D.N.Y. 2013)

(Weinstein, J.)(guidelines 78-90 months, sentence of probation warranted in part because

"[e]vidence of a defendant's efforts at rehabilitation is persuasive. It is indicative of the

likelihood that a defendant will not reoffend and will not cause harm to the public");

Brenda L. Tofte, *Booker at Seven: Looking Behind Sentencing Decisions: What Is*

*Motivating Judges?*, 65 Ark. L. Rev. 529, 572-73 (2012) ("[W]hen it comes to

sentencing, judges look at what offenders have done to rehabilitate themselves when

deciding what kinds of sentences to assign. Accordingly, in the data set . . . sentencing

judges were swayed by offenders' rehabilitation efforts almost as much as they were

swayed by offenders' family obligations and family support.")


6. Variant Factor- Paul's Childhood


There is little doubt Paul experienced a traumatic and disadvantaged childhood,

which helped to put him on the path to the matter before this Court. As outlined in the

PSR, Paul's childhood was filled with lack of stability, drugs and alcohol, and rejection.

Courts have consistently considered childhood factors as a basis for a lower

sentence. *United States v. McBride*, 2007 WL 4555205 (11th Cir. Dec. 28, 2007) (finding

non-guideline sentence of 84 months, a departure from a term of 151-188 was sufficient

but not greater than necessary. Among the factors considered where the severe physical

abuse defendant suffered and having been shuffled between foster homes until adulthood); *United States v. Lopez*, 938 F.2d 1293, 1297-99 (D.C.Cir. 1991) (remanded for district court to consider a departure from 51 month sentence imposed in drug case because defendant was exposed to domestic violence as a child, his mother's murder by stepfather, his need to leave town due to threats, and having grown up in slums of New York and Puerto Rico ); *United States v. Ruiz*, 2009 WL 636543 (S.D. N.Y., March 11, 2009) (judge imposed 96 months rather than guideline range of 140-175 months for crack offenses in part due to defendant's difficult childhood with abusive mother and largely absent father who was incarcerated and a heroin addict, and the absence of any prior substance abuse assistance); *United States v. Samuels*, 2009 WL 875320 (S.D. N.Y. April 2, 2009) (time served imposed rather than guideline range of 70-87months for young woman from abused background who was embarrassed by her drug sales and did not tell her family though she sold them to support them); *United States v. Handy*, 2008 WL 3049899 (E.D.N.Y. 2008) (court imposed 30 month sentence rather than guideline range of 37-46 months for 20-year-old who was effectively abandoned as an infant and separated from siblings,); *United States v. Santa*, 2008 WL 2065560 (E.D. N.Y. 2008) (court imposed 120 months as a variance from a guideline term of 262-327 months for a mentally ill defendant based on difficult childhood and life); *United States v. Germosen*, 473 F. Supp. 2d 221 (D. Mass 2007) (where guideline range was 37-46 months for conspiracy involving heroin importation, a sentence of 2 years of probation with six

months home confinement was warranted partly because defendant had dealt with and was prepared to overcome difficult circumstances of his youth); *Landrigan v. Schriro* , 441 F.3d 638, 648 (9th Cir. 2006) ("Where a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse."); *U.S. v. Walter*, 256 F.3d 891, 894 (9th Cir. 2001) (in presidential threat case, downward departure warranted due to combination of beatings by defendant's father, introduction to drugs and alcohol by his mother, and abuse at the hands of his cousin); *United States v. Brown*, 985 F.2d 478, 481 (9th Cir. 1993) (proper to grant downward departure in light of psychological report detailing childhood of severe abuse and neglect); *United States v. Floyd*, 945 F.2d 1096, 1100 (9th Cir. 1991) (departure from guideline of 360 months–life to 17 years reasonable due to defendant's lack of guidance as a youth) (overruled on other grounds).

In *United States v. Shift*, the district court departed ten months from the guideline range and imposed the mandatory minimum sentence, finding that defendant's lack of youthful guidance, and acceptance of responsibility indicated that ten additional months of incarceration would serve no deterrent or retributive purpose to defendant or to general public. 2008 WL 2906884 (N.D.Ind. 2008). Perhaps no argument better summarizes the situation as it relates to Paul What would be gained by a prison sentence?

## SUMMARY

"If ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant." *U.S. v. Adelson*, 441 F.Supp.2d 506 (S.D.NY 2006). In this moment, with both Paul and his family's future in the balance, we ask that this Court sentence Paul to a time served sentence.

## REQUESTED SENTENCING RECOMMENDATIONS

Based on the foregoing, Mr. Archer makes the following requests for Judicial recommendations at sentencing:

1) Paul be sentenced to time-served with three years of supervised release;

2) In the event the Court deems additional incarceration time as necessary, we request it to sentence Paul to home detention;

https://www.justice.gov/file/1266661/download.

3) If the Court deems actual incarceration necessary, that Josh be placed at Ft. Devens or alternatively, in a facility in Florida to be close to his family;

4) If the Court imposes a sentence of greater than 30 months, the Court recommend Paul for the RDAP program;

5) That only the mandatory fine and assessments be ordered in this matter as Paul will need to focus on his tax debt.

Dated this November 27, 2025 at Portland, Maine.

Respectfully submitted,

*s/David J. Bobrow*
David J. Bobrow, Esq.
Attorney for Paul Archer
DAVID J. BOBROW, OFFICE OF LAW, LLC



P.O. Box 466
Portland, Maine 04112
207-835-1525

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | **1:22-cr-0140-SDN** |
| | ) | |
| PAUL ARCHER, | ) | |
| DEFENDANT | ) | |

## CERTIFICATE OF SERVICE

I, David J. Bobrow, Esq., hereby certify that I have caused to be served via ECF Paul Archer's Sentencing Memorandum on the following individuals:

1. AUSA Andrew Lizotte at andrew.lizotte@usdoj.gov;
2. All other attorneys of record in this matter.

Dated this November 27, 2025 at Portland, Maine.

Respectfully submitted,

*s/David J. Bobrow*
David J. Bobrow, Esq.
Attorney for Paul Archer
DAVID J. BOBROW, OFFICE OF LAW, LLC



P.O. Box 466
Portland, Maine 04112
207-835-1525